We will hear United States v. Mirilishvili. Good morning. Good morning, Your Honors. May it please the Court, I'm Daniel Marmer, and I represent Dr. Moshe Mirilishvili on this appeal. Your Honor, this Court said in Wexler that evidence of the standard of care is not irrelevant or prejudicial in these types of cases. To the contrary, it is only after assessing the standard of care that it is possible to evaluate whether a defendant's conduct strayed so far from that standard in order to be deemed criminal. Despite that ruling, the district court in this case said that standard of care is not an issue and may not be testified to by the defense expert. That set up a tremendous dichotomy for the jury that almost inevitably led to a conviction here because the defense in this case was that Dr. Mirilishvili operated a clinic that was essentially subpar. Certainly in retrospect, there were many things that were left to be desired. But that was- Wasn't the jury instructed with the correct standard, though, from Wexler? The jury was not- Well- They were told it had to be other than for a legitimate medical purpose, other than in good faith, and not in the usual course of medical practice. It was told that, right? Yes, that is- That is the right standard. That is the criminal standard, correct. And the defense expert was able to address that, right? Defense was able to address that. What you have is, and the government typically, this typically comes up when the defendant complains that the government is putting in excessive amounts of expert testimony and evidence about what is the general standard of care. I couldn't find a case, there all seem to be cases where the government was permitted to put in the standard of care evidence. Correct. Are there any defendant's objections to that? Are there any cases where the defendant was precluded from doing that? No, it's a good question. And I couldn't find any, but I think what happened here was the defense accepted that paradigm. The defense said, okay, look, we understand that you have to be able to talk about what is the general practice in here, pain management, if you're gonna talk about how far something's strayed. We accept that burden, but what we want is a defendant, actually, I'm gonna return to your question in one second to complete the answer, but what we want is to have a doctor who's gonna be able to give the jury a little more orientation about where that standard of practice ends and where criminal might begin, or at least give the jury. Labels, though, I mean, that you wanted to use, because, I mean, I noticed on page 20 of the government's brief, they quote from some of the redirect, says you were able to ask the expert, there's a big range of types of practices that a doctor may have in terms of the level of care. Could that go from the best possible down to be doing better? In other words, you seem to be able to put forth the defense that, hey, look, this wasn't, this was subpar medicine, we acknowledge that, but it wasn't criminal, and so what you couldn't do was use the term standard of care, but why was that so important? I think it's more than that, Your Honor. I admit there's a little bit that comes in that creeps back in, that the defense was able to get in on the redirect of its own witness, but that was not essentially the thrust of it. If I can just return to Judge Stroni's question, I think there is an answer, because it doesn't come up specifically as an appellate issue in the Court of Appeals, but I'll point out two cases to Your Honor, or three cases, actually. In the case Zolot, Z-O-L-O-T, where Dr. Warfield was able to testify, there was, and there was an acquittal there, there's a pretrial decision which indicates that she was able to testify much more broadly with respect to the medical standards. In the Chube case, C-H-U-B-E, which is a Seventh Circuit case, where there's a discussion, extended discussion of what happened in the trial court, the trial court allowed the counsel to draw out, I'm quoting now, the distinctions between the civil and the criminal standards in the opening, in the cross, and in the closing. And if I could also refer to Allere, A-L-L-E-R-E, which is cited by Chube, and also by this court in Wexler, where there's a little more of a fulsome discussion allowed about the standards. And I appreciate that some stuff does come in, and what really is at the heart of the problem, I believe, is that this is difficult stuff for lay people. We know. But it seems to me that what you, the point you wanted to make, that you couldn't make, and almost the only thing that you couldn't establish, is that this doctor may have been committing malpractice. And even if he was committing malpractice, that's not a crime. But the standard from Wexler is that it has to be not in the usual course of medical practice. Now, malpractice is not the usual course of medical practice, I hope. But that's correct, Your Honor. And the judge finds that important enough of a point to instruct that this is not a malpractice case, but she hasn't allowed any evidence about what is a malpractice case. So by doing that, what the jury is hearing are standards really almost of best practice. But the standard is that it has to be not in the usual course of medical practice in order to be a criminal, but also that it has to be other than in good faith. There's a good faith element to that, although that's an objective standard too, which is a bit odd, but seems to have been what is accepted now. So it's really a question of sort of what red flags he may have missed, et cetera. But when you look at the testimony of Gariba, who starts this whole thing, he is asked over and over and over by the government questions that really go to sort of top-level care, really excellent care in pain management. And the jury is hearing that. And what the defense was in this case, because there was a lot of practices that are indefensible medically, but the defense... I'm sorry. It's a harmful error. The evidence seems to be overwhelming in this case. In a year and a half, 99% of his prescriptions were oxycodone. He had no medical staff. He had lines going around the block. 95% of the prescriptions were for 90, 30 milligram pills of oxycodone. He was found with a million seven in cash in his house. There's so much evidence that what he was doing was outside the normal course or usual course of medical practice. How do you show this, that there's harmful error? Let me make two basic points in response to that, Your Honor. First of all, there was a dispute about the level of practice. Certainly the numbers are what the numbers are. But if you look at, there was five pieces of testimony, five people who testified about what actually went on in that room. All five of those, including a government undercover who was sent in, right? Supposedly to say, hey, I got no pain. Go ahead and give me the drugs. Doesn't do that. Goes in and gives a whole story. And the doctor spends 15 to 20 minutes with him. Dr. Garibo even sort of grudgingly says that was appropriate treatment. All five witnesses who were in that examination room said the doctor did what the doctor should be doing. To be sure, what is his default? His default is oxycodone is a miracle drug and people should get it. But that's for the jury to decide when they have both sides of the story. If you look at other pill mill cases that are out there, they're extraordinary even compared to what happened here. Doctors who are never seeing patients, doctor who are presigning prescriptions, doctors who are writing multiple ones a day, doctors who are falling for the I lost it. Those cases are so far beyond what happened here. Obviously forged medical documents. Some of which were found in his home. Well, the fact that he took home the records itself was the defense, right? That he took them home at times, he didn't have the room in the office. But that doesn't mean that he was forging them and it doesn't necessarily mean that he saw them. No one ever testified that he saw them. To the contrary, what- I'm not saying he forged them, but somebody forged them, right? Well, somebody certainly forged them. That's no doubt. But the defense here was that Correa and Leonard were found that they had a soft mark as a doctor and were able to take advantage of that. Were able to pull the wool over his eyes. There was expert testimony, if I see my time is- Well, you've reserved two minutes of rebuttal. Okay. You can use it now or we can use it later. I'll save it. Thank you, your honor. Let's hear from the government then. Good morning. Good morning, and may it please the court. My name is Edward Discan. I represent the United States on appeal. I also represented the United States below. If I may, let me start where Judge Joni just was, which is from the government's perspective, this was not a case about the standards of care. It certainly was not a case about medical malpractice. There was overwhelming evidence that this defendant was knowingly and intentionally engaged in, and indeed orchestrating, a criminal conspiracy. Contrary to what Appellant's counsel just said, the witnesses who testified, and in particular, the three patients that the government relied on, and I use that term loosely, did not say that everything that the doctor did was normal or acceptable. The undercover referred to oxycodone by its street name, M30s, after he handed cash to the doctor in the examination room in return for his prescription, which he continued to get month after month after month, notwithstanding the fact that he did absolutely none of the other things that the doctor said he might want to consider, such as physical therapy, such as other forms of treatment. The other thing. The doctor did prescribe physical therapy for some people. Correct, a significant component of the government's case were the things that Dr. Miralichvelli was doing to try and cover his tracks. So for example, he would ostensibly recommend things like physical therapy, or seeing a specialist, but wouldn't actually follow up on them. Did the charge or the evidence leave the jury room to decide that this doctor was negligent? No. And committing malpractice through laziness and oversight, but not criminal? No, Your Honor, for two reasons. The first is, as Judge Stroni correctly noted, the jury was specifically instructed they could not so find. The jury was instructed correctly. There is no dispute that the jury instruction here was correct, that in order to convict the defendant, it was not sufficient for them to find that he was simply a bad doctor. They had to find that he knowingly and willfully participated in a conspiracy to write prescriptions with no medical purpose. That is, that he ceased to function as a doctor, but instead functioned as a member of this conspiracy. So one, the jury is properly instructed on that, but two, there is overwhelming evidence that that's actually what happened here. The government called two cooperating witnesses, each of whom testified to a direct criminal agreement with the defendant, one of them a man named Abraham Correa, who started as a patient of the doctor's, and is then hired by the doctor to serve as his bouncer, despite the fact that the doctor has written him an oxycodone prescription, because he ostensibly has such crippling pain that he cannot survive without it. The other, a man named Damon Leonard, is hired by the doctor, even though he is also a patient, and his job. Back to the expert question, though. Yes. Which Nicholas was asking about, too, and that is, in the letter briefs on the objections to the expert for the defendant, I didn't see Wexler cited by anybody in the district court's written decision. I didn't see Wexler mentioned by her, either. And Wexler does say, standard of care is usually permitted in these kinds of cases. Did anybody bring Wexler to her attention, or why not? It seems like a big case. Wexler certainly was brought to the court's attention in the context of the request to charge, which she would have had at that point. The letter briefing, I think, was focused a little bit more specifically on the facts, the facts of the expert disclosure. But in terms of the Wexler standard, and whether or not Judge McMahon's ruling ran afoul of it, I think Judge Shea is right, that this is really more of an issue of labels than it is of substance. Because if you look at what the Wexler court actually said about the testimony in that case that was offered about the standard of care, what it said was that the expert would be allowed to testify about the scope of medical care provided by those who engage in the practice of dermatology. Because in that case, the doctor was a dermatologist. And there is no question that both experts here were allowed to testify to just that. That is, the scope of the medical care provided by those who engage in the practice of pain management. That is what the Wexler court had in mind when it said you should be allowed to offer testimony about the standard of care. That is what it is a reasonable doctor under these circumstances might do. And again, I don't think there's really any serious dispute that both experts were allowed to do that. What Judge McMahon was concerned about was introducing new terms to the jury. Because the government had not used the term standard of care. The government's expert had not used the term standard of care. And so her ruling was, I would like you to stay away from that term, which I think is going to be confusing to the jury. But if your expert wants to testify about the actual underlying issue, that is, what a reasonably prudent doctor in these circumstances would do, she is free to do that. And indeed, she did do that. She did that at some length. Your adversary's argument is that Dr. Warfield was between a rock and a hard place. Because since she had to testify either that what was done was within the realm of what a good doctor or even a mediocre doctor or less than excellent doctor would do. Whereas what you have here could actually just be worse than poor without actually being criminal. And it's that interval that the expert was called to testify to. How was that bridged? So two responses. The first is that I don't think Dr. Warfield was actually permitted from giving most of that testimony. Dr. Warfield was entirely free to say that what Dr. Miralichvili was doing was not common, was not typical, was not something I would instruct my students to do, is not something I think is a good practice. All of those things she was perfectly free to say. And in some cases, she did. If you go back and you look at the transcript, for example, at transcript 1239, she said that one of the things she was asked about was not particularly common, but not outside of the scope. Which is certainly the point that they were trying to make. That Dr. Miralichvili was doing things that perhaps the best doctors in the world might not do, but was still within the scope of the legitimate practice of medicine. What they seem to want, at least in their appellate briefs, is for her to have done something completely different. Which is to say, this is what medical malpractice is, this is what criminal activity is, and I am opining this was medical malpractice. And that was improper for two reasons. The first is, she's not a legal expert. And so she's not in a position to testify with authority to the jury that this is the standard for medical malpractice because she's not an expert on that. But the second, and the far more troubling thing about that, and this did come up in the letter briefing before Judge McMahon below, is that distinguishing between medical malpractice and criminal conduct almost always turns on the mindset of the defendant. So the appellant uses the example of leaving a sponge in a patient. In order for an expert to opine on whether or not leaving a sponge in a patient constitutes malpractice or criminal conduct, the expert would have to opine on whether or not it was intentional. And there's absolutely no way that Dr. Warfield could be an expert on whether or not the doctor intentionally left the sponge in the patient, or it was an accident, because she never even met the doctor. Because your time's running low. I wanted to ask you a question about the forfeiture. Yes, please. So in the closing argument, the government said that with respect to the majority of patients that Mirashvili gave prescriptions to, he wasn't acting as a doctor. And then said, let me make clear, there have been some patients in pain, some patients who needed oxycodone. That's not the question for you. In other words, the government seemed to concede that there was some group of patients who needed pain medication. In light of that, how do you defend the district court's use of all the cash transactions as the basis for forfeiture? Because I believe the remarks your honor was just pointing to in the summation had to do with the insurance patients. The government took the position at trial, which is entirely consistent with the defense. But wasn't one of the defense witnesses a cash patient? Correct, and we argued she was not legitimate. The defense called two patients, one of whom was a cash patient who she argued was part of the pill mill. She was the one whose daughter was getting the exact same prescription, and had simultaneously been seeing another doctor who was also convicted of running a pill mill. The second was an insurance patient. But the government's position all along was that we were going to concede simply for the sake of argument that the insurance patients might be legitimate, and we were going to focus our trial evidence on the cash patients. So with respect to the cash patients, where was that position articulated that I might find support for the notion that minority meant insurance only? Certainly, I think it's actually, if you go back and look at those comments in the summation, it's also we make the same point in the rebuttal, where we focus the jury on the cash patients. But it's also in the summary chart, which we included in our appendix, and which we gave to Judge McMahon in support of our forfeiture order, where we broke out his earnings by dividing them between his cash patients and his insurance patients. And the forfeiture number comes exclusively from the cash patients. OK, thank you. Sure. Unless the panel has questions, I'm happy to rest on our session. Thank you. We'll take your questions. Thank you, Your Honor. A couple of quick points in rebuttal. I think Judge Jacobs hit the nail on the head when you asked the question, reflecting the charge, whether it left any room for the jury to decide that there was negligent conduct here, but not malpractice. I'm sorry, criminal. And I think that's really the core of our case here, which was whether there was room in this case, both our positions from an evidentiary perspective, what was allowed in, for the jury to make that determination. And our position is it wasn't, that Dr. Warfield was so hobbled by this decision, by this pretrial decision, that she wasn't able to elucidate that. And what the cases say, and what the commentary says,  distinguishing between civil and criminal. And especially in the areas of medical. Why did the charge cure that? Because the judge said, you must remember, this is not a medical malpractice case. It's not enough for the government to prove any degree of negligence, malpractice, carelessness, or sloppiness. Because she didn't allow evidence to support that, and she never defined those terms for the jury. So those terms out there don't really mean much without the context that the defense expert was intended to give them. And I do want to address, Judge Drony, you asked the question about why wasn't Wexler more prominent. There's, I think, a more full answer to that. The defense, the government moved to preclude Dr. Warfield before the defense even was able to put in a response. The judge, I think in an attempt to give some guidance before the testimony, issued a decision. And it's clear that she issued that decision before the defense even put in a response. The government did not cite Wexler, which really would have been the controlling authority. The defendant was able to put in two letters with its expert disclosures to describe what the testimony would be and the reasons that she would be able to testify to that. So even though there wasn't a response from it, there was a lot of writing about what the expert would say and what's the basis for it, right? Well, there was Rule 16 disclosure. I don't think that a defendant would normally put in legal authority necessarily to say. There was no legal authority in there, I believe. It was simply disclosing what she was going to testify to, and it was done consistent with what the prevailing Second Circuit law was. And just a final point, I know my time is up or over, but just with respect to forfeiture, because I think that's an important point, too, here. I don't know that it's fair that the government says that we distinguish between insurance patients and cash patients for purposes of the jury, or that that's what the jury heard. Well, they did in their charts, though, right? The charts do make that point. But that's not, whatever their position is, doesn't absolve the district court from making appropriate findings here. The district court simply adopted a PSR and said, well, OK, all cash patients were illegal. But she never made findings to support that. The evidence was to the contrary on that. There were plenty. Even Dr. Garibo, their expert, testified, with respect to insurance or cash or otherwise, that he reviewed only 23 files. And he used the term majority of those seemed to be outside the practice, which obviously implies that a number of them were not. And there are cases, we cite three cases in our briefs, I think, that indicate pretty clearly it is not enough to take such a small subsample and make that extrapolation. I'm not saying she had to order that all of them reviewed. I think there's How else would she have done it? There are, well, the test under What basis would she use to estimate using your? Well, for example, I mean, first of all, when you have the government's expert saying, not all of these are fraudulent, that tells you right away there's a problem with extrapolating and saying they all are. So what this court has said in Tracy was that reasonable extrapolation is the standard. That's fair. Dr. Garibo, in a state case, analyzed some 200 files to determine which ones specifically were and were not. Other courts have rejected exactly the same number as what was here in terms of what was appropriate. The Evans case, which we cited, it was either 10 or 20 files out of 700, I think, that were reviewed. That was considered inappropriate. In Chube, it was 10 out of 98. That was inappropriate. And then in this court, in the Archer case, it was 4 out of 171. That was inappropriate. Thank you. Thank you. Thank you both. We'll reserve decision.